## McRAYE v. UNITED STATES.
### No. 11247.

Circuit Court of Appeals, Ninth Circuit.

Oct. 13, 1947.

George B. Grigsby, of Anchorage, Alaska, (E. Coke Hill, of San Francisco, Cal., of counsel), for appellant.

Raymond E. Plummer, U.S. Atty., of Anchorage, Alaska, for appellee.

Before DENMAN, STEPHENS, and ORR, Circuit Judges.

ORR, Circuit Judge.

Appellant was charged with murder and found guilty of manslaughter. During the month of October 1945, two of the inhabitants of Seldovia, Alaska, were appellant Walter E. McRaye and Michael McDonough, the deceased. These men had fished commercially during the 1945 fishing season and then took up residence in the same house. McDonough moved into the jointly occupied house at McRaye's invitation. In this community of Seldovia there also resided one Doris Stephan, a sister-in-law of McRaye. The Stephan girl and McRaye were close friends, had been intimate, and according to a statement made by McRaye were to be married as soon as McRaye obtained a divorce from his wife, from whom he was separated. The friendship between McDonough and McRaye continued until McDonough and Doris became enamored of each other and began "going steady." From this time on an increasing coolness seems to have arisen between McDonough and Mc-Raye. McDonough vacated the house in which he and McRaye had been living, at the invitation of McRaye. The Stephan girl and McDonough began living together. McRaye resented this very much and according to the evidence threatened "that if McDonough ever laid a hand on Doris he would shoot him, or kill him—something to that effect." McRaye requested Doris to leave Seldovia and go to Deep Creek and as an inducement to get her to leave promised to "grubstake her." Doris consented to go and so informed McDonough. After being informed of Doris' intention to leave Mc-Donough locked her in his house to prevent her leaving. McRaye learned that Doris was locked in McDonough's house, went there and released her.

McRaye and Doris proceeded to the house of a mutual friend and did some drinking. McRaye left this friend's home and pro-

ceeded to his home. He was joined there by Doris about 15 minutes later. A short time thereafter McDonough came to McRaye's home. He was invited to enter and upon doing so produced a pint bottle containing about three drinks of liquor. He offered McRaye a drink, a friendly gesture, which McRaye declined. McDonough stated that he desired to talk to Doris. He and Doris went into McRaye's bedroom. While in the bedroom McDonough slapped Doris, causing her nose to bleed. McRaye, upon ascertaining that McDonough had struck Doris, requested McDonough to go home, to which McDonough replied, "I will go when I get good and ready"; whereupon McRaye walked across the room to a pantry and secured a loaded shotgun. After securing the gun McRaye stated: "This will put you out." At this point Doris attempted to get the gun but McRaye shoved her aside, at the same time stating, "You lay off or else you will get it too." Shortly thereafter a shot rang out and McDonough fell to the floor with a wound in his head from the effects of which he subsequently died.

McRaye's defense was that he fired the shot in defense of his life and in fear of receiving great bodily harm. It was his contention that McDonough had the pint bottle in his hand in an upraised position and he, McDonough was advancing toward him in a threatening manner. Doris testified that just before the shot was fired the bottle was sitting on the table; she did not see it in McDonough's hand, saw no threatening movement and McDonough did not take a step toward McRaye until after the shot was fired. Her testimony evidently was given credence by the jury. After the shot was fired Doris went to the home of one Jack Fields and was followed by McRaye. The first words spoken by McRaye after reaching the Fields' residence were: "Well Jack, I done it." "I shot the big son-of-a-bitch." "I didn't miss." "Go get Andy," referring to Andy Anderson, Deputy United States Marshal. Anderson placed McRaye under arrest and as he prepared to take him to jail instructed McRaye to get his (McRaye's) coat which was in the bedroom of McRaye's home. McDonough had not been removed from the place where he had fallen. In order for McRaye to get his coat it would have been necessary for him to step over McDonough's body. This McRaye refused to do saying, "I'm not stepping over that son-of-a-bitch."

The foregoing is a summary of the evidence viewed in a light most favorable to the appellee. Borgia v. United States, 9 Cir., 78 F.2d 550.

It is the contention of appellant that the foregoing evidence is insufficient to sustain the verdict of manslaughter. We do not agree. The jury was extremely lenient with appellant. Under the evidence it would have been justified in finding a verdict of murder. The statements made by McRaye to Jack Fields immediately after the shooting are not those of a man recently compelled to take decisive measures to defend himself from the infliction of great bodily harm or in defense of his life but are more in accord with the boasting of a cold blooded killer. McRaye had threatened to kill McDonough "if he ever laid a hand on Doris." McDonough struck her and McRaye made good his threat.

Appellant complains of the admission of certain testimony relative to McRaye's being intimate with Doris, giving her liquor and slapping her, claiming such testimony tended to degrade him. Because of the inferences the jury could have drawn from the testimony of appellant relative to his being the protector of the good name of the girl Doris, it was proper for the Government to show his relations with her.

On cross examination the United States attorney asked the defendant certain questions relative to his connection with an organization known as the I. W. W. We see no excuse for such conduct. The relationship had nothing whatever to do with the case. The questions were improper and the objections thereto should have been sustained. However, because of the overwhelming character of the evidence in this case we cannot find that the error complained of in any manner prejudiced appellant.

Appellant complains of an instruction given by the court relative to intoxication because no defense of intoxication was urged. There is evidence of appellant

870

having taken drinks; hence, it was proper to instruct as to the legal effect of intoxication.

Appellant attacks instruction No. 7. We think the instruction correctly stated the law.

Exception is taken to instruction No. 7A which reads in part: "The resident owner or lawful resident occupant of a dwelling house always has the right to order a trespasser * * * to leave the house, and if the trespasser will not leave on request and persuasion, then the owner or occupant has the further right to use such force as reasonably appears to be necessary to compel the trespasser to leave the house * * *." Appellant contends that the words "request and persuasion" should have been given in the disjunctive as the law requires only that the "lawful occupant" request or persuade. Under the circumstances of this case appellant was not prejudiced by the use of the words in the conjunctive. According to appellant's testimony he did both. He requested appellant to leave and exhibited a loaded shotgun which is quite universally recognized as a very efficient "persuader".

Other alleged errors are pointed out. We have examined them and find them to be without merit.

Judgment affirmed.